

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **21-60263-CR-SMITH/VALLE**

18 U.S.C. § 1349
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

WILLIAM HYMAN,

         Defendant.
_____/

## INFORMATION

The Acting United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

### Medicare Program

1. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4. Physicians, clinics, and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

## Part B Coverage and Regulations

6.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7.     Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania. Palmetto GBA ("Palmetto") was the MAC for the consolidated Medicare jurisdictions that included Georgia, Alabama, Tennessee, South Carolina, North Carolina, Virginia, and West Virginia.

8.     To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this [provider]. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the [provider]'s compliance with all applicable conditions of participation in Medicare.

9.     CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10. Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Cancer Genomic Tests

11. Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

12. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

13. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the

management of the beneficiary's specific medical problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

14. Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

### The Defendant and Related Individuals and Entities

15. LabSolutions, LLC ("LabSolutions"), a limited liability company formed under the laws of Georgia and authorized to provide services in Florida, was a laboratory that purportedly provided CGx testing to Medicare beneficiaries. LabSolutions held an account ending in 3925 at Branch Banking and Trust Company ("BB&T") (the "LabSolutions Account").

16. Minal Patel, a resident of Georgia, was the owner of LabSolutions.

17. Wellness Medical Services, LLC ("WELLNESS"), a limited liability company formed under the laws of New Jersey, was a marketing company. WELLNESS held an account ending in 4420 at TD Bank (the "Wellness Account").

18. Defendant **WILLIAM HYMAN**, a resident of Florida, owned and operated WELLNESS and was a signatory on the Wellness Account.

### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

From in or around March 2017, and continuing through in or around July 2019, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**WILLIAM HYMAN,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Minal Patel and others, known and unknown to the Acting

5

United States Attorney, to commit an offense against the United States, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

19. It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries, CGx tests, and doctor's orders to laboratories, including LabSolutions, so that the laboratories could bill Medicare for CGx tests, without regard to whether the beneficiaries needed the tests or whether the tests were eligible for Medicare reimbursement; (b) paying kickbacks and bribes to doctors and other medical providers in exchange for ordering and arranging for the ordering of CGx tests for beneficiaries, without regard to the medical necessity of the prescribed CGx tests or whether the tests were eligible for Medicare reimbursement; (c) submitting and causing the submission of false and fraudulent claims to Medicare for CGx tests that were not medically necessary and not eligible for reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

20. **WILLIAM HYMAN** and other co-conspirators recruited beneficiaries by conducting health fairs and inducing beneficiaries to take CGx tests regardless of whether the tests were medically necessary or eligible for Medicare reimbursement.

21. **WILLIAM HYMAN** and other co-conspirators offered and paid kickbacks and bribes to doctors and other prescribers in exchange for orders for CGx tests that were not medically necessary and not eligible for Medicare reimbursement. The orders were written by doctors and other prescribers who had no prior relationship with the beneficiaries, were not treating the beneficiaries for cancer or symptoms of cancer, and did not use the test results in the treatment of the beneficiaries.

22. **WILLIAM HYMAN** and other co-conspirators provided the doctors and other prescribers with pre-filled lab requisitions forms—also known as prescriptions—which pre-selected which genes the doctor or other prescribers would order to be tested for the beneficiaries.

23. **WILLIAM HYMAN** and other co-conspirators selected the genes to be tested based on how much Medicare reimbursed for the tests, irrespective of the medical history, physical findings, or medical needs of each specific beneficiary, in an effort to maximize Medicare reimbursements and, in return, their kickbacks from the laboratories.

24. **WILLIAM HYMAN** and other co-conspirators agreed with Minal Patel and others to receive kickbacks and bribes in exchange for referring the Medicare beneficiaries, CGx tests, and orders to laboratories, including LabSolutions, so that the laboratories could submit claims to Medicare for the CGx tests that were not medically necessary and not eligible for Medicare reimbursement.

25. **WILLIAM HYMAN**, Minal Patel, and other co-conspirators caused LabSolutions to submit false and fraudulent claims to Medicare in the approximate amount of at least $1,633,261

for CGx tests that were: (a) induced through kickbacks and other illicit incentives; (b) designed for maximum reimbursement and regardless of medical need; (c) not medically necessary; (d) not eligible for reimbursement; and (e) not properly prescribed by a doctor.

26. As the result of these false and fraudulent claims, Medicare made payments to LabSolutions in at least the approximate amount of $705,818. In turn, LabSolutions paid **WILLIAM HYMAN** kickbacks totaling approximately $142,928.

27. **WILLIAM HYMAN** and other co-conspirators used the fraud proceeds received from laboratories, including LabSolutions, to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE
## (18 U.S.C. § 982(a)(7))

1. The allegations of this Information are re-alleged and by this reference fully incorporated herein for purposes of alleging criminal forfeiture to the United States of certain property in which the defendant, **WILLIAM HYMAN,** has an interest.

2. Upon conviction of a conspiracy to commit a violation of Title 18, United States Code, Section 1349, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, pursuant to Title 18, United States Code, Section 982(a)(7).

3. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been co-mingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7) and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

JOSEPH S. BEEMSTERBOER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ALLAN MEDINA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

PATRICK J. QUEENAN
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

WILLIAM HYMAN,

_____Defendant/

CASE NO._____

**CERTIFICATE OF TRIAL ATTORNEY***

**Superseding Case Information:**

**Court Division:** (Select One)

- [ ] Miami
- [ ] Key West
- [✓] FTL
- [ ] WPB
- [ ] FTP

New defendant(s) [ ] Yes [ ] No
Number of new defendants _____
Total number of counts _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) **No**
   List language and/or dialect _____

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)
   - I   0 to 5 days      [✓]
   - II  6 to 10 days     [ ]
   - III 11 to 20 days    [ ]
   - IV  21 to 60 days    [ ]
   - V   61 days and over [ ]

   (Check only one)
   - Petty       [ ]
   - Minor       [ ]
   - Misdemeanor [ ]
   - Felony      [✓]

6. Has this case previously been filed in this District Court? (Yes or No) **No**
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) **No**
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No) **No**

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No**

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) **No**

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No**

_____
PATRICK J. QUEENAN
DOJ Trial Attorney
Court ID No.   A5502715

*Penalty Sheet(s) attached

REV 3/19/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**     **WILLIAM HYMAN**

**Case No:** _____

Count #: 1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud

**\*Max Penalty**:     Ten (10) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>William Hyman,<br>*Defendant* | )<br>)  Case No.<br>)<br>)<br>) |

**WAIVER OF AN INDICTMENT**

    I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

    After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

                                                                                                       *Defendant's signature*

                                                                                             *Signature of defendant's attorney*

                                                                         PAUL WEIGARTNER, ESQ
                                                                     *Printed name of defendant's attorney*

                                                                                                   *Judge's signature*

                                                                             *Judge's printed name and title*